You have two cases on the calendar today. The last case, United States v. Moore, is on submission. So the only oral argued case is the first case, Edrei v. Maguire. Good morning, Your Honors. May it please the Court. My name is Ingrid Gustafson, appearing on behalf of the appellant officers. I would like to reserve three minutes of my time for rebuttal, please. Your Honors, this is a straightforward, qualified immunity case. On multiple levels here, there is a lack of binding precedent that would govern the conduct here. Can I ask you, just at the outset, I'd like to get to the question of whether there are any factual disputes. I understand your position in terms of the law, but looking at your allegations, you say that you stipulate to the plaintiffs factual allegations. You characterize the crowd, though, for example, as hostile and potentially violent, and these are factual characterizations that the video at least raises some questions about. I'm not saying that ultimately your position wouldn't prevail, but at this stage of the proceedings where there are factual disputes, how can you prevail? Several points, Your Honor. First, as ought a motion to dismiss, as Your Honor points out, all of the facts in the complaint are accepted as true to the extent they are not contradicted by the video evidence, and all inference is drawn in the plaintiff's favor. So there are no factual disputes at this point. However, even the district court in this case characterized the circumstances here as increasingly confrontational. Plaintiffs themselves allege that bottles, glass bottles, were thrown in the direction of the police officers. There was one bottle, right? And I'm not saying that I don't know how that cuts, but there was one bottle. My recollection of the allegations in the complaint was that it was bottles, numbers unspecified. The point here, though, Your Honors, is You accept as true what's in the complaint, as you just told us, right? Absolutely, and I believe it was plural. Whether it was confrontational or not, is that a fact, or is that an opinion? The facts are viewed from the perspective of a reasonable officer at the scene, and if Your Honors disagree with any aspect of the characterization as escalating or hostile, it doesn't change the ultimate outcome on this qualified immunity appeal. You're saying it doesn't matter whether the extent to which the crowd was acting up or was hostile? I think it's a given, isn't it, that this was not a peaceful protest, a quiet, peaceful protest anymore. It had gone on for many hours. That is correct. And people were in the street. At the very least. And so one could, I don't think it would be hardly a stretch to say that they were obstructing traffic. I mean, the traffic at 57th and Madison was not able to go through. That is, at the very least, Your Honors, we have a tense set of circumstances where bottles were being thrown in the direction of the officers, according to plaintiffs. We have a large group of protesters in a major intersection of midtown Manhattan. Under those circumstances, there is simply no clearly established law that would have put these officers on notice. I think the other side is saying that, you know, the law that has developed in other uses of force, that is pepper sprays, flash bombs, whatever they're called, flash bangs and tasers, would apply here and they would have been on notice. Why wouldn't that be the case? For several reasons, Your Honor. The analogy to those devices I don't believe holds. Those devices are intended to incapacitate their targets, which is far from what we have here. Plaintiffs' own allegations, as the district court found, showed they were not incapacitated, were able to move freely around the scene and, in fact, even to pursue the officers using the device here in order to film it. Some of the uses of these other devices seem to me have been less involved in crowd control than kind of a brutal treatment by the police for people who were handcuffed or were otherwise controlled and cases of that sort. So they wouldn't really apply here, right? That is absolutely correct, Your Honor. For example, the use of the tasers case law. Most of the pepper spray case law is used on people who were either subdued or handcuffed at the time and Let me ask you this. The Garcia case was a case in which the police were criticized and I think one of the allegations by the plaintiffs in that case was that they didn't give appropriate warning to people to get back off the streets and back into the place where the protest was supposed to occur. Is that correct? In other words, they hadn't given enough warning. That's correct, and there was a strong implication in the complaint in Garcia that the officers should have used an acoustic device under those circumstances because it is very difficult to hear announcements when, as here, you have a loud scene and it simply does not meet the high standard of liability here or overcome the qualified immunity. The duration of the use of the LRAD here? According, it was used at varying intervals. No, but I thought that there was a three-minute, something about three minutes. I don't know what that means. It was used over the course of three minutes according to plaintiff's own complaint and that is substantiated by the videos. Yes, and the videos show, I think the videos. I think all of us have seen the videos. Rebut any contention that it was continuous through that period. It was varying intervals throughout that period, and there is simply no law that would have put these officers on notice that the use of this device to aid. Well, you've got Terabisi, right? And Terabisi talks about acoustic weaponry, and this is acoustic weaponry, isn't it? It mentions. It says that common sense should be applied and there should be some proportionality. Terabisi mentions acoustic weaponry in a footnote as a device that has been developed. It certainly doesn't purport to reach acoustic weaponry. What the Court, I think, found central, and this is what they said in Terabisi, was that the flash bang explodes. And what the Court said was the Fourth Amendment applies with clarity to a device that explodes. And the facts of Terabisi were certainly more extreme than those here. Remind me about that case. Was that a Fourth Amendment case or a Fourteenth Amendment case? It was a Fourth Amendment case, Your Honor, and it involved. The allegations were that the officers in that case blindly threw flash bangs, which explode, into someone's home when they had no specific reason to think that they were going to be presented with a danger, and the raid resulted in the death of one of them. Do we agree that the test here, at least as far as the officers were concerned, was the Glick test, that shocks the conscience test? Yes. And not an unreasonableness test? Yes, Your Honor. This Court has been clear that outside of the seizure context, the test is whether the conduct shocks the conscience. The phrase that this Court has repeatedly used is whether the conduct is brutal or inhumane. There's a several-part test, right, to Glick, right? Yes. Now, in this case, and again, I'm not saying you wouldn't ultimately prevail. I'm just talking about where we are at this stage, where there seem to be some disputed facts about. . . is really whether the methods were proportionate to the situation at hand. And so, how would you respond to this, that there was no order to disperse first? According to plaintiff's complaint, there was a dispersal order before the LRAD actually was used. That's in plaintiff's own complaint. I think it's not known at this time how much time there was necessarily after that. Wouldn't you need, in order to give an appropriate dispersal order, wouldn't you basically have to have had an LRAD-type bullhorn to cover the number of people involved in order not to run afoul of Garcia? The officers here were certainly using the device to give clear dispersal orders. I mean, that is . . . That's clear from the tape. Yes, absolutely. That's in addition to the sound made by the LRAD. Yes, Your Honor. They were using a microphone, as I saw in the video. They were using a bullhorn as well as the LRAD. I actually did not see the bullhorn on the video, Your Honor. You could use the LRAD in two ways, right? One is to give an order of some kind, and the other is to use the device to basically cause such severe damage to one's senses that it would have the desired effect from the government, the law enforcement's point of view. So the fact that LRAD may or may not have been used in terms of the order does not go to the second question, and that is whether the use was proportionate. And I'm not saying that ultimately, as I say, that you wouldn't prevail. The question is, given what we know, given the disputed facts, can we say at this point on this motion to dismiss that you can prevail? That's really the nub of the question, not ultimately whether you would prevail or not. Now, you've got Kingsley v. Hendrickson, and you say that it's irrelevant because it was decided in 2015. And I understand your point, but when we think about qualified immunity, there's a two-part analysis. And with respect to whether Kingsley is clearly established law, I certainly take your point. But as to that first step, whether there has been a violation under Kingsley, isn't Kingsley relevant at all? Two points, Your Honor. I take the point that on the underlying constitutional violation, the law would be taken as it presently stands as opposed to in 2015. But Kingsley addressed a narrow question, that is, whether there was a requirement that a plaintiff show that the alleged conduct was malicious and sadistic in the pretrial detention conduct in order to state a 14th Amendment excessive force claim, which is not at issue here, and which did not purport to overrule. It doesn't make sense to me that one could say that under Kingsley that there are certain rights that obtain for pretrial citizens, but that they don't apply to those who are free, as you have in this case. I mean, the logic of Kingsley is that the protesters should be covered. How could it not be? If Kingsley applies to pretrial detainees, how could that rationale not apply to those who haven't been arrested at all? Because, as the Supreme Court said in County of Sacramento v. Lewis, there is a difference in the custodial context. In County of Sacramento v. Lewis, when the Court was considering the various mental states that might be required to show a substantive due process claim, the Court emphasized that in that circumstance was the high-speed police chase, that that was a very different circumstance than pretrial detention, which is custodial, where someone has the right to leave taken away, the right to care for themselves. But in any event, in the motion-to-dismiss context, the question in qualified immunity that is perhaps most easily addressed is whether there is clearly established law that prohibits it. We have to look at December of 2014, correct? Yes. How the law stood at that time. Absolutely, Your Honor. And I would like to emphasize that Kingsley did not purport to overrule the Supreme Court's case law in the area of Shocks v. Conscience. The Court emphasized again in County of Sacramento v. Lewis that the 14th Amendment is not intended to cover the field of state tort law. To what extent, I mean, the complaint says that these officers were acting deliberately in pointing the LRAD. Do you have a response to that? I certainly take the allegations of the complaint as true, but there is, I have several points, and I think they're all important. I wasn't sure about that after I saw the video, how that played out. I think the video certainly would contradict any conclusion that there was an intent to harm here. Even plaintiffs have never made that argument. The device was used in close proximity to other police officers, with other police officers walking in front of it. You can clearly see on the video, which according to plaintiff's own affirmations before, the District Court shows a use of the acoustic device in close proximity with the device pointed toward people on the sidewalk. No one is fleeing. Very few people are even covering their ears. Notice that some people, there were a couple of people who put their hands up like that. I did it this morning coming down here on the subway. But you're right, people were walking around, and that raises to my mind the question about, there were a lot of, in the brief, there was a lot of factual material about the LRAD 3300. But this is not the LRAD 3300. This is the LRAD 100X. Is that material relevant to the 100X? Is it the same device, but just in a smaller package? Or is it a different device? It's a much quieter device, Your Honor. It has a much lower maximum volume. For example, this device could never pop someone's eardrum. My question is whether the allegations in the complaint regarding any testing or the information that we've been given, maybe it's been included by reference, regarding the testing that occurred by the New York City Police Department, really says nothing about this device. And that we have to kind of exclude that from our thinking and just focus on what there is that's said about this device. I mean, right? Yes, Your Honor. And the fundamental point is that there is simply no law or no other source that would have put these officers on notice that what they were doing was an obvious constitutional violation, at the very least. What do you think that the police department itself did that would have put these officers on notice? At this stage, taking the complaint, the allegations in the complaint as true, no. For example, as plaintiffs allege themselves, the device did not and does not appear on the officer's continuum of force. I'm not even sure reasonable police officers would have thought they were in the force world at all, let alone force that was so excessive that it would satisfy the high standard for liability here. It would be so obvious that it would violate the 14th Amendment. What about the First Amendment? This was a legitimate First Amendment demonstration. Respectfully, those claims are not before the court on this interlocutory. We need to balance. What shocks the conscience is different when you have a First Amendment being exercised as opposed to someone who was just being a pest. This was a First Amendment. It goes to the very core of the First Amendment, this demonstration, and the use of force applied has to be balanced against the First Amendment rights of the demonstrators. Wouldn't you agree? I'm not aware, Your Honor, of any case law that certainly would have put the officers on notice that— Well, it was the First Amendment, and what shocks the conscience is different in the First Amendment context than in other contexts. I have never seen a case reaching that conclusion, Your Honor, and since we're analyzing these facts from the perspective of a reasonable officer at the scene, I don't believe that that— The reasonable officers would have heard of the First Amendment, wouldn't they? They absolutely would have, Your Honor. That's comforting to know. Absolutely. But under the circumstances here, which were tense, which involved bottles being thrown at the officers, there's no clearly established law that the officers were required to wait before acting. The exercise of the First Amendment was apparent right from the beginning, right? And people who are protesting and doing it in a calm way, an orderly way on the sidewalk, are exercising their First Amendment. But apparently that was not the issue here. The police weren't using whatever the LRAD 100X was against people who were—because everybody was staying on the sidewalk. People were not staying on the sidewalk, right? That is correct, Your Honor. That's apparent from the video. And even the district court here found that moving the large crowd out of the intersection and onto the sidewalks was a reasonable time, place, and manner restriction, that there were no facts to support an inference that the officers here were simply acting in retaliation for expression of First Amendment rights. But ultimately, the only question before this Court is would it have been clear, would it have been obvious to these officers, to every reasonable officer, that what they were doing was violating the Fourth Amendment, and there simply is nothing. Now, we've got cases like Parmelee in Amnesty America, which suggests that—indicate that uses of force can be inappropriate, where, for example, in Parmelee, we said that officers may not use force where the protesters are nonviolent. And your view is that there was violence or potential for violence. And you've got Amnesty America, where we said that officers are not entitled to qualified immunity when they gratuitously inflicted pain in a manner that was not a reasonable response to the circumstances. If there is a factual question as to whether LRAD induces significant pain, isn't that a jury question? Isn't that something that, at this stage, the jury should decide? No, Your Honor. Again, the question is always, from the perspective of the reasonable officers, would it have been clear that what they were doing violated here the Fourteenth Amendment, which distinguishes this case, too, from the two cases that you have cited, which were both Fourth Amendment cases. And I think Parmelee actually presents an instructive contrast. In that case, the protesters were on private property. The officers arrested those protesters as a group. And in the course of those arrests, the allegations were, I believe, beat the protesters. We—and that was found to be unreasonable. We have nothing like that here. The officers did not carry out mass arrests. Instead, they chose to use a novel acoustic device to aid in moving a large group of protesters onto the sidewalk. That conduct simply does not reach the level of something like Parmelee, which, again, was even a Fourth Amendment case. And the standard here is substantially higher. I have to agree with you that a sound device is better than bullets in terms of moving people. But there's no question that some of the participants were harmed by the use of this very loud sound device. You'll concede that, won't you? I certainly accept the plaintiff's allegations at this point as true. Those injuries, certainly, though, in comparison to some of the other injuries we have seen in the case law, are certainly lesser. And that is one factor this Court considers. But it is certainly not the only factor. At the end of the day, again, it must have been clear to these officers at the scene that their conduct shocked the conscience. And it obviously, as a matter of qualified immunity. Thank you. Thank you. May it please the Court, Gideon Oliver, I represent the Appalese, along with Elena Cohen and Michael Decker. Can you help us understand what factual disputes there may be? Sure, Your Honor. I think the Court reviewed the complaint in the video and drew all the reasonable inferences in plaintiff's favor. And as the Court, I think, noted, there are a lot of characterizations of what was going on, words like chaotic, escalating, hostile, violent, volatile. And to the extent that the defendants, the appellants, are encouraging the Court to construe the facts in the video in the ways that are not in the light most favorable to plaintiffs. And in some cases, in ways that conflict with the district court's description of the same events, watching the same video, they're inviting the Court to resolve what are appropriately factual disputes that should be the subject of discovery and perhaps, ultimately, jury determination. Well, for example, on the question of whether there was a general dispersal order, what is your view? Well, there is a single allegation in the complaint that's based on one second on one video where I could hear a police officer. I do not think it was over the LRAD or any form of amplification. In some substance, giving what could be construed as a dispersal order. It's very brief and it occurs at the intersection. Essentially, as people are in the process of moving away already from the arrests that are going on at the intersection, the pepper spray that had been already used at the intersection. Is this before, and this is before the LRAD? It is, Your Honor. It's absolutely before the LRAD. Before the LRAD use. So why isn't that enough to constitute a general dispersal order? I mean, I don't think it was a general dispersal order where they were telling people that they needed to leave or leave the area. I think it was a reaction to what was going on in that very moment in the intersection and very shortly after those. What would the order have been? Would it have been to get back on the sidewalk? Leave the sidewalk? When the court says what would the order have been? If there had been, I mean, at that time, if there had been a general dispersal order, it wasn't to go home. It was to get back on the sidewalk, wasn't it? Well. That's where they had been and that's where apparently they were no longer at this point. I mean, the order, though, is get back. It's not get on the sidewalk. That initial order that happens for that one second and that one moment is an order to get back. It's certainly not. That's right. It's not an order that says get on the sidewalk. When the LRAD was used, there was an order to, I forget now, was it to disperse or was it to get, what was the verbal command? Well, there are about nine or ten instances of verbal commands. They kind of repeated themselves. They do. There are slight variations, but, Your Honor, most of those directions are not dispersal orders. They're not directions to get on the sidewalk. They say remain on the sidewalk. They're clearly directed at people who are already on the sidewalk, who for the most part are already either complying with police directions or reacting. They want people to come off the sidewalk. That's understandable. That is understandable. That is an understandable direction, Your Honor. But at the same time, the police, as they are communicating those messages to remain on the sidewalk, obviously targeting people who are on the sidewalk, they are also almost continuously firing the deterrent tone on the LRAD for about three minutes. And we could talk about what almost continuously means, but if you look and listen to the video, it is not a constant three-minute tone that's uninterrupted. But it is almost continuous for the course of those three minutes as they're traveling down. If the officers did give a dispersal order, then how can you prevail under clearly established law under the 14th Amendment? Well, even if the officers gave a dispersal order, that doesn't justify the excessive use of force in the case. I mean, the fact that the police gave a dispersal order doesn't give them carte blanche to use as much force as was used in this case in order to effectuate compliance with the order if that's in fact what they were intending to do or trying to accomplish, which I think in and of itself raises questions of fact. They seem to want credit that they were using a nonlethal force. As opposed to bullets, as the Court pointed out. Yes, I think that's right. And to that point, although the appellants say that the shocks to the conscience standard is essentially more stringent and from our perspective sort of insurmountably high, the bottom line I think is that the concept of conscience shocking can't be applied mechanically and it varies according to the different environments in which the alleged excessive force occurs. This is a non-prisoner, sorry, a non-prisoner, non-seizure context. And just as in Johnson v. Click, Justice Friendly said that it would be absurd to hold that a pretrial detainee has less constitutional protection against acts of prison guards than one who has been convicted under the Eighth Amendment. It would be similarly absurd to hold that the same use of force is unconstitutional when a person is arrested under Graham, but constitutional when they're not. Does it make a difference that this was the First Amendment context? Absolutely, Your Honor. The First Amendment context makes a difference and reasonable officers would have necessarily considered the First Amendment context, I think. These were reasonable officers in the position of these officers in the sense that they were acting on the basis of whatever training and knowledge they may have had, whatever thinking they may have had about this device. Would you agree with that? I would absolutely agree with that, Your Honor. If you agree with that, let me ask you this. The complaint is full of allegations that the department was remiss that they lacked any training in the use or effect of the LRAD. Sections, paragraphs 97 through 99, make that very clear, that the use of force policy was woefully inadequate. So there wasn't training. There wasn't training on de-escalation, adequate training on de-escalation. The procedures for documenting and reporting force incidents were fragmented. The use of force policy is vague and imprecise, providing little guidance to individual officers. That was a report in 2015, which you said was not improved by anything that happened after that. And that's your main claim against the city, isn't it, that they lacked training? That is the main basis of the Monell claim. The Monell claim. That's right, Your Honor. It's in your complaint, and so what I'm saying is, if an officer is not given proper training, and it's not even listed on the use of force protocols under paragraph 102 of the complaint, which include hand strikes, foot strikes, everything else, other than LRADs, and it wasn't updated later on when they changed it so that it's still not, as far as I can tell, still not there as a use of force mechanism, how are these officers to know that what they were doing might violate the Constitution, let alone that it would be beyond debate? It's an obvious case, Your Honor. It was and it should have been obvious. In what way was it obvious? Well, obvious because if you look at it one way, it's obvious. If you look at the back of the device that they were operating, if you have the perspective of the officer who is operating the LRAD, there is a clear diagram that shows that the device can't be safely operated within 30 feet. There's a 30-foot sort of cone in front, and it has a red zone. So your point is that these officers were what, incompetent? Or were they knowingly violating the law? I don't think you can make out the point that they were knowingly violating the law, where they hadn't been trained at all, and there was no legal precedent there. So I guess your argument is that they were incompetent. I think there could be ultimately a finding that they were plainly incompetent. Yes, Your Honor. I mean, if the manufacturer's guidelines and the warning label gave them these devices to use, they were authorized by higher-ups to go use them, and they weren't given any training, so how is it that there could be a plain incompetence when there's no training to measure competence against? You know, if you're given training and you violate the training or you violate the protocols, then you're acting incompetently, it seems to me. But do they need training to read the label on the device? Exactly, my point, Your Honor. It was right there in front of them, wasn't it? It's obvious. They didn't need training. You know, a person doesn't need training to not drop a hair dryer in the bathtub. You know, they look at the warning label. It says if you do this, it's going to be dangerous. Your point is that notwithstanding the fact that it wasn't used in the force protocols, that they must have known that this was the use of force even though the department wasn't telling them it was. Absolutely, absolutely. I think it's a yes, Your Honor. That has to be yours because there's no other out for you other than that. I mean, you know, it seems to me that you got from reading the complaint and if you take the allegations, you're going to have a heck of a case against the city for lack of training based upon these LRADs, assuming that the 100X has the same features as the 3300, which I don't know anything about, and your complaint isn't clear on that. But whether the individual officer should be personally liable under these circumstances, it seems to me a different question than, you know, liability of the city for lack of training. In fact, the lack of training seems to cut against you. If I could on the training point, Your Honor, it's absolutely the qualified immunity question is determined from the perspective of the reasonable officer with the same training and experience as the officers, the two officers who are the defendants here. And it's not just... Or lack of training. Absolutely, Your Honor. But I don't think it's just training in LRAD use or training in use of force that would be relevant to determining the reasonableness of the use of force in this case. It would also be training in crowd and disorder control, for example, how police react when they're making arrests and there are perceived and actual threats, people coming up too close, et cetera, clearly topics the police department has training on, as well as training related to policing First Amendment assemblies and First Amendment principles. You agree we don't have a case that deals with LRADs. Yes, Your Honor. I do agree. And it's a novel device. Yeah, novel device. But it's not novel factual circumstances in terms of police uses of force in the non-arrest... What's your best case for that? Because you have to deal with White against Pawley. I do, Your Honor. I do, Your Honor. And my question was, what's my best case? Well, I mean, I think my best 14th Amendment cases are the cases that say that even a slap... Which cases are those? Robinson v. Villa, for example, and Smith v. Half Hollow Hills. And Smith, although the court says that the single slap in that case didn't rise to the level of a 14th Amendment violation, the court says there's no per se rule against finding a 14th Amendment violation based on even a single slap. So cases like Smith, Robinson... What about Terebizi? And Terebizi. Those are the 14th Amendment cases that I would go to first if the court were saying, where's the 14th Amendment cases? But certainly the analogous cases in the Fourth Amendment context involving so-called less lethal weapons and crowd control devices include Terebizi, Tracy v. Freshwater, include Terebizi and Tracy v. Freshwater and other cases that we cite. But those are two of the, I think, the big Second Circuit cases. Let me ask you this, if I could. You focus on Kingsley as a standard. But as your adversary points out, Kingsley is a 2015 case. And while it may be relevant in terms of the first part of our understanding of the Qualified Immunity Test as to whether it's clearly established law, it couldn't be clearly established law under Kingsley because Kingsley takes place, is issued after the developments in this case. So what I'd like you to do is to look at Glick and Glick's tests and walk me through it and why you would prevail under Glick. Yes, Your Honor. Not under Kingsley, but under Glick. Understood. The four Johnson v. Glick factors. The first factor, the need to use the force. I'll collapse the first two factors, I guess. The need to use the force versus the relationship between the need to use the force and the amount of force that was used. Proportionality. Proportionality. That's right, Your Honor. At the intersection, the need to use force was, I would say, minimal at best, although nonexistent. The police had blocked traffic viewing the events and the like most favorable to plaintiffs. By the time the plaintiffs and the rest of the- They knew this was forced, not because they'd been told in any training, but because the label would indicate. That's your point. The label is one thing, Your Honor. Also, it's marketed. The X100 specifically is marketed. The warning tone feature of the X100 is marketed. A reasonable policeman would have had to read the marketing materials. Is that what you're saying? I think that- Well, it's not just the marketing materials. It's also the instructional materials that come with the device, which I think a reasonable officer who is going to operate the device, certainly for the first time, would be expected to read or at least to understand. I mean, certainly if the instruction manual said if you use it this way, it has the potential to be dangerous or harmful. Or at least read the label, which was right on the device they had in front of them. That as well. So you don't think there's a chance that the officers might have recognized that this is a very powerful bullhorn, might have thought of it in those terms? Absolutely not.  Certainly it's not how it's marketed. Even in the marketing materials that describe the sort of megaphone function, it goes into how it functions differently. It's designed to predict sound up to 200 feet at a maximum with a continuous volume of up to 136 decibels. And the prior larger version the police department bought in 2004, which is the subject of the 2010 testing, gets up to 146 decibels. Is your claim here that all LRADs are unconstitutional? No. Not per se. Absolutely not. This is an applied case. It's not a facial challenge. That's correct, Your Honor. That's right. I have a question since this is an as-applied case. Is there any evidence that these protesters were violating any law? They're certainly not accused of violating any law. The police were not trying to arrest anyone. Is there evidence that they were following the order to stay on the sidewalk before this device was employed? With respect to some plaintiffs, certainly there's evidence. And with respect to the remaining plaintiffs, by the time the LRAD was deployed, the scene was, as Judge Sweet said, largely under control. Can I bring you back to my question, which is could you walk me through the Glick facts? Of course, Your Honor. Of course, Your Honor. I do want to get back to Judge Walker's question. But to walk you through the Johnson factors. At the intersection, the police had blocked traffic by the time the protesters got there. Neither plaintiffs nor other protesters were substantially interfering with the arrest activity that was going on. Even after bottles were thrown, the protest was, as Judge Sweet said, broadly in control. The officers used pepper spray. And by that point, people, including plaintiffs, were either on the sidewalks or getting there. The intersection was substantially clear of non-police persons. Substantially clear, not entirely clear of non-police persons, but substantially clear. There was minimal need to use any further force at that point, which is when they first activated the LRAD. And then when they first used the LRAD, the safety threats associated with the arrests that were being made had already abated. That situation was under control. And the threats that were the target of the LRAD were the, I would use air quotes around threats, those threats, the threats that had already occurred at the intersection were not the target of the LRAD deployment. Nevertheless, after what happened at that intersection, the officers used the pain compliance tone, setting aside the use of the sort of megaphone speaker, they deployed the pain compliance tone indiscriminately, purposely, at least viewing the facts in the light most favorable to plaintiffs, I think, purposely aiming the LRAD at people on the sidewalk, firing it as it is designed to go, in sort of a cone, without individualized justification, meaning without distinguishing between people in the beam or target area who were complying, innocent people who were merely walking by, observers who wanted to record what was going on, etc. So indiscriminately, almost continuously, over the course of almost three minutes, the defendants fired the pain compliance tone between 15 and 20 times in bursts. And the blasts obscured the verbal messages that were also being transmitted. And the LRAD was also used... Well, I mean, the complaint's viable, obviously, is what we follow, the allegation of the complaint, unless they're contradicted by the video. And I thought that the commands were, when I saw the video, were pretty clear. I didn't see them being obscured, the commands to get back, you know, to go keep on the sidewalk or whatever they were saying. I mean, you know, we could debate that, but I guess it's just a duel between the complaint and the video on that score. And, I mean, the court certainly can consider the video. We conceded that the district court could concede the video below, as long as it scrupulously viewed the video in the light most favorable to plaintiffs. And so if you look at the video and you find that it utterly contradicts with the material fact in the complaint, then... I'm questioning whether the, as soon as they started using the other device, the other feature, that it obscured all of the commands. It doesn't... I didn't sense that. It doesn't necessarily make it so that they would, the recording would be, it would be impossible for us to discern the language that the police were using on the recording that we're listening to. But I do think, I mean, for me it was, it certainly took, for us, it certainly took a lot of time to get the actual verbiage that was being used into the declaration, Mr. Decker's declaration. The whole point of what the police officers intended to do was get people on the sidewalk, right? Get them out of the intersection, blocking automobile traffic. I mean, I think those, that's a, I think really that's a question of fact. What did the police intend? That's what they say. That's certainly what they say. So then why would they point the LRAD at the sidewalk, as you just pointed out? Those were people who were absolutely compliant with whatever orders they got. Could be because they were acting maliciously. No, but that, that is the shocks the conscience test is when people are exercising their First Amendment rights and complying with whatever order the police made and then they still get this sound. That's, that's the analysis that has to take place. Absolutely, Your Honor. And another factor that goes into the proportionality analysis to go to Judge Katzmann's question is that the LRAD's pain compliance tone was deployed over those approximately three minutes, very close by, within 10 feet of plaintiffs. When, again, that manufacturer's warning that's on the back said, do not enter within 33 feet during continuous operation in front of the LRAD. There was no need to use force against people on the sidewalk who were compliant. I saw the police were walking unmolested in the, on the street, in the gutter, as we used to say, growing up in Brooklyn. They were walking where the cars traveled and there was, there were no people there. That's right, except for other police officers and police vehicles who were on that street, on the roadway at the time. On the roadway, that's the phrase. Yes, Your Honor. You say to your adversary's point that there was, the police were, were all over the place and they, you know, were not, would have been within range of this and therefore, you know, were they using, were they using this device on their own, their own police? I mean, would, they would have been subjected to hearing problems as well, right? I mean, I think that's certainly quite possible. I don't, I don't see police that are, I don't recall at this point seeing police that were directly in the cone that I was talking about. It's hard to figure out from the video where the cone was, at least from my perspective. I wasn't sure where it was. Yes, well, helpfully perhaps, the LRAD Corporation's marketing materials have some graphics where, you know, they show you an LRAD and then they have like a green cone that goes through, you know, five blocks of Times Square. So, and then moving on from proportionality, the extent of the injury, oh, sorry, before I do that, in terms of proportionality, as police got further away from the intersection at which the arrests occurred, the need, the purported need to use the force abated, but the force did not. It continued or escalated as, as those three minutes went on. So, and the extent of- When you talk about force, you're talking about the effect of the force. Yes, Your Honor, I am. And, you know, I think the Supreme Court cases say that when you're talking about physical force, it's physical just modifies, you know, it's not emotional or, you know, in a very sort of basic way. Another factor that the, among the Johnson factors is the extent of the injury. In excessive force terms, the extent of plaintiff's injuries in this case is relatively serious. Certainly, as Judge Sweet found, they each allege injuries that go beyond the de minimis threshold. The injuries were sustained, involved lasting effects. And so I think that covers the extent of the injury prong. And then the fourth prong is whether the defendants applied the force maliciously and sadistically in order to cause harm, rather than in a good faith attempt to restore order. I think that prong raises classic questions of fact that need to be explored in discovery, which is why malice can be pleaded generally. We did plead malice here generally. And repeatedly firing the pain compliance tone at plaintiffs and others on the sidewalk, using the LRAD in obviously dangerous ways that violate the manufacturer's warning labels and instructions on the back of the LRAD, could all be construed ultimately as evidence of malice. At this stage in the game, without discovery and viewing the facts in the light most favorable to plaintiffs, that's how I see the malice prong. I think that covers the Johnson factors. I mean, I think it's also worth noting as to the fourth factor that, I think it's also worth noting with respect to the fourth factor that when force that is employed maliciously or sadistically in the absence of a legitimate objective that would justify it, and when it results in injury, that force is presumptively unconstitutional and conscience shocking. That's this court from Johnson versus Newberg. As to the fourth factor, the fourth factor is not necessarily a requirement, is it? I don't think it is. That's right, Your Honor, I don't think it is. Just if I could brief, I am out of time, but I'd like to get back to the, if I may, briefly about how the officers were, given that we allege they didn't have training about this particular device, how are the officers supposed to be on notice? The marketing materials for the 100X, which is sort of, I think, improvement on and miniaturization of the previous version that was purchased in 2004. When you say improvement, what do you mean? Smaller, mostly smaller is what I mean. Designed for the use by police instead of the Coast Guard or something? I mean, I think that they certainly market the 100X for the same types of military grade area denial applications that the LRAD was initially designed for use in, but certainly part of the pitch to police departments is that the 100X is something you can walk around with, as these officers did, not something that you need to mount on the back of a vehicle. But in terms of the marketing for the 100X, the LRAD Corporation consistently says that what they call the warning tone or the deterrent tone can be used to modify behavior. It can be used to increase force time, to scale force escalation. Other product sheets use language like shaping behavior. When the tone is used at close range, protesters sense audible discomfort, cover their ears, and move away. And the marketing materials even say that law enforcement agencies that have concerns about the deterrent tone can easily disable the option. I mean, I think all of those facts, and there are some others, but I think are the kinds of facts that show that the defendants in this case knew or should have known that using the LRAD in certain ways, certainly in violation of the manufacturer's... And different defendants here, it would seem to me that the police commissioner should have known, but what about a line officer? That's what we're talking about here. You're trying to hold the officers who did it liable, as opposed to the police department, and as a whole, for lack of training and knowledge on their part, of the force component of this device. So that's where I'm struggling, as you can tell. So one other question I have here is the... Was the use of the... First of all, you agree that we're looking at shocks of the conscience. We're not looking at the reasonableness test, and we're not looking at Kingsley, for purposes of this motion, of this particular aspect of the case, qualified immunity. I think that shocks of the conscience is the right test. Now, Judge Sweet didn't use that term, in his opinion. My impression was that he talked about it was being unreasonable or inappropriate, that it was inappropriate at one point. I think he used those terms. I don't know that he made a finding of shocks of the conscience. Maybe you can point that out, if he did. Sure, Your Honor. I think I could do that in just one moment. Somebody's working at it. That's right, Your Honor. I'm trying, Your Honor. My recollection, and we'll try and pull this, is that... Your adversary, at least I think, argued to the contrary in her brief. Certainly, at some points, Judge Sweet used some language, like used the word unreasonable, for example. That's right. And unreasonable is the Fourth Amendment test, I think. I mean, that's normally what you see under the Fourth Amendment, whether it's reasonable or not. But shocks of the conscience is a higher standard. It's certainly a different standard in this context. In this context, because... unreasonable, and we don't have Kingsley yet, at the time that he's analyzing the officers, you know, what the officers did, then it seems to me that might be error. If that were all the Court were relying on, I mean, I would disagree, but that might hypothetically be the case. But I don't think that... I mean, certainly that's not... The analysis that the Court undertook was an analysis of the Johnson factors. The Court looked at and discussed all of the Johnson factors. In any event, we're looking at this de novo. You know, we've got the same complaint that he had, and the same materials that he had, right? Yes, Your Honor. Yes, Your Honor, although I would come back to the... I guess you relied a lot on Sweet, and I just wondered about some of his findings. Yes, Your Honor. I mean, our position is that Judge Sweet got it right, and the Court should affirm and remand. I'm significantly over time. I would rely on the papers unless there are other questions from the Court. Thank you. Okay, thank you, Your Honor. We'll endeavor to be brief, Your Honor. My main points, I think, were in my opening argument. I would like to address a few specifics. First, on the dispersal order, in Plaintiff's own complaint, this is page 50 of the record, Plaintiffs say, Plaintiff Horst then heard the police yell and summon substance for everyone to get on the sidewalk. So I just wanted to be clear that according to Plaintiffs, there was a dispersal order to get on the sidewalk, not merely to get back, although that also is in the video. Page 50 of the appendix? Page 50 of the appendix, that's right, Your Honor. Secondly, on the issue of the diagram on the back of the device, that diagram does, it shows the cone of sound and says, don't enter within 30 feet during continuous operation. I think the videos here rebut any contention that this was continuous operation by the officers, and in any event, it's a constitutional question, and there was, I don't believe that a diagram would put officers on notice that they were violating the Constitution. On the glick factors, I listened very carefully to my adversary's analysis, and it was highly complex analysis. And for the purpose of this qualified immunity appeal, the question is would it have been obvious to the officers that what they were doing violated that standard, and it certainly wasn't obvious to me. On the issue of the protesters on the sidewalk, the officers here were faced with a fluid and ongoing situation. The videos clearly show that there were still individuals in the street in front of the officers, even after they began using the device. They also show, not everyone certainly, certain protesters step off the sidewalk after the police use the device. Once we start getting into the details about distances, I think we're in qualified immunity territory. It's a matter of judgment, and mistakes of judgment can be made. That's why we have the qualified immunity doctrine, so it's not to overly hamper officers. We want the officers to be able to do what they believe is the correct thing, unless they're told specifically that they can't do it by pre-existing law, or what they're doing is so obviously violative of the law that they are on notice on that basis. Yes, Your Honor. The Supreme Court has clearly held there is ample room for mistaken judgments. It is only those officers who are plainly incompetent or knowingly violate the law who are not entitled to the qualified immunity defense. In addition to the standard on qualified immunity, what is the standard that we should apply in overturning Judge Sweet's findings? It's abuse of discretion, correct? No, Your Honor. It would be de novo on an appeal from a denial of a motion to dismiss on a qualified immunity appeal. What about his findings? As a motion to dismiss, Your Honor, I don't read the District Court as making factual findings. If it did, that was error. This is a motion to dismiss. There are no facts. There are no issue of facts. To the extent that this Court disagrees with any of the characterizations of the video, this Court is not required to accept them. But based solely on the complaint, and what even plaintiffs agree is clearly shown in the video, the officers here did not violate clearly established law. I would like to point out that this is the first time that it is possible that I have missed it somewhere in the record that plaintiffs have ever alleged that the conduct here could be deemed malicious. Plaintiffs have never made that allegation. The police, again, I think the videos contradict any such allegation. I think the video 1, for example, at minute 2, second 50, through minute 3, seconds 15, does show other officers walking. Nevertheless, under Glick, it's not a requirement, right? It's just suggestive that that's a factor. That's correct. This Court has never held that's the only way you can shock the conscience. But nonetheless, it is the ultimate — shocks the conscience is the ultimate inquiry. So the inquiry is not was it unreasonable, was it disproportionate. The terms the district court used were that there was a disconnect, that it was inappropriate. The Court cited the shocks of conscience standard when talking about the general standards, but the Court did not ever hold that it shocked the conscience, only that it was inappropriate. In order to reach the shocks the conscience standard, it's going to need to be so grossly disproportionate that it shocks the conscience. And that's simply not what we have here, especially considering the additional layer of qualified immunity. Again, it is easy after the fact to disagree with specific decisions made, but the Supreme Court has been clear that qualified immunity protects from mistakes in judgment. It is only intentionally unconstitutional conduct that is not afforded qualified immunity here. Thank you, Your Honor. Thank you both for your arguments. We appreciate them. The Court will reserve decision. The second case on the calendar, as I noted earlier, U.S. v. Moore, is on submission. The Clerk will adjourn court.